UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BRENDA ANTHONY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIV. NO. SA-06-CA-1009-JWP |
| | * | |
| POTEET HOUSING AUTHORITY, | * | |
| | * | |
| Defendant. | * | |

## FINDINGS AND CONCLUSIONS

In this lawsuit, filed pursuant to 42 U.S.C. § 1983, Brenda Anthony alleges that the Poteet Housing Authority ("PHA") violated federal statutes and regulations by including money she receives, as compensation for the care of her disabled son, as income in determining the amount of her monthly rent. Both parties have filed motions for summary judgment based upon undisputed facts. (Docket nos. 26, 27 and 28). Having considered the motions, the subsequent briefing (docket nos. 29, 30, 31, 32), the facts, and the applicable law, the Court is of the opinion the motion of the PHA should be **GRANTED** and Anthony's motion should be **DENIED**.

### Background

The United States Department of Housing and Urban Development ("HUD") administers federal funds given to local housing authorities who provide affordable rental housing for low income families through the Section 8 housing program. **42 U.S.C. §**

**1437f(a)**.   In determining eligibility for participation in the Section 8 program and the amount of rent a family will be required to pay, local housing authorities use income-limits and formulas established by law.   Public housing tenants may choose between paying a flat rate or an income-based rate.   **42 U.S.C. § 1437a(a)(2)(B)**.  Anthony has lived in public housing in Poteet with her family since 2000 and has chosen to have rent calculated based upon income.

Anthony's 23-year old son, Gilbert, was diagnosed with multiple sclerosis in 1998, is bed-ridden, and requires 24-hour care.  Gilbert qualified for certain services, including personal care attendants through the State of Texas Community Based Alternatives ("CBA") program.  He began participating in the CBA program when he turned 21 years of age on November 22, 2004. Effective January 1, 2007, Gilbert began participation in the STAR+PLUS (State of Texas Access Reform Plus long term care) program.  Under the CBA program and the STAR+PLUS program, an individual plan of care is designed for each participant and approved by the State.  Gilbert Anthony's Individual Service Plans effective for 2004, 2005, 2006, and 2007 have all provided for personal assistance services.

Until January 1, 2007, the State of Texas Department of Aging and Disability contracted with private companies to provide home and community-based services under the CBA program to eligible

2

participants.  One of those providers was MED TEAM, Inc.  Brenda Anthony secured employment in November 2004 with MED TEAM as a personal care attendant for her son under the CBA program.

Effective January 1, 2007, Gilbert began participation in the STAR+PLUS program.  Participation in the STAR+PLUS program is mandatory in order to receive in-home Medicaid care in lieu of institutionalization.  Clients must choose an approved health maintenance organization ("HMO") in order to receive Medicaid assistance. The STAR+PLUS program is administered entirely through private HMOs that contract with the Texas Department of Health & Human Services as accepted HMOs under the program.  The HMO develops an individual plan of care with the participant and family members and can authorize services.  The emphasis is on providing home and community-based services to avoid the need for institutionalization.

On April 12, 2007, Brenda Anthony was separated from her employment with MED TEAM, because MED TEAM decided it would no longer contract to provide services to Gilbert Anthony.  On April 26, 2007, Brenda Anthony became employed by Saldivar Primary Home Care working as a personal care attendant for her son, Gilbert. She was assigned, along with another individual, to provide care to Gilbert under the STAR+PLUS program.  Saldivar contracts with Superior HealthPlan, Inc. (Gilbert Anthony's HMO) to provide health care services under the STAR+PLUS program.  Superior HealthPlan is

3

reimbursed through the State of Texas and the federal government through Medicaid.

From December 1, 2004 through November 30, 2005, the PHA excluded all of the income derived by Brenda Anthony from MED TEAM in calculating the amount of her monthly rent.  From December 1, 2005 to November 30, 2006, the PHA excluded 50% of that income, thus raising Anthony's rent by $164 to $339 per month.  As of December 1, 2006, the PHA included all of Anthony's MED TEAM income, raising Anthony's rent to $504 per month.  Effective from December 1, 2006 through May 31, 2007, Brenda Anthony's monthly net tenant rent was $504 as calculated by the PHA.  Effective June 1, 2007, and continuing at present Brenda Anthony's monthly net tenant rent is $538, as calculated by the PHA.

## Analysis

Anthony raises three causes of action in her complaint.  She states that:

(1) the PHA has violated the federal statute, 42 U.S.C. § 1437a(b)(4), requiring HUD to define income for the purpose of calculating rent for low income housing, and the implementing regulation, 24 C.F.R. § 5.609(c)(16);

(2) the PHA's failure to exclude income has resulted in her paying more rent for low income housing, in violation of 42 U.S.C. § 1437a(a)(1), (3); and,

4

(3) the PHA's violation of the federal statutes and regulation results in a violation of the Supremacy Clause.[1]

Anthony seeks a declaratory judgment, injunctive relief, damages, and restitution, and attorneys' fees.

For purposes of determining income-based rent, the term "income" means "income from all sources of each member of the household, as determined in accordance with criteria prescribed by the Secretary, in consultation with the Secretary of Agriculture ..." **42 U.S.C. § 1437a(b)(4).** The statute defines "income" but makes no provision for exclusions from income. However, as authorized, the Secretary of HUD promulgated regulations implementing the statute which includes a provision excluding some types of income from the calculation. **24 C.F.R. § 5.609(c).** The relevant subsection states that "[a]mounts paid by a State agency to a family with a member who has a developmental disability and is living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home" shall not be included in annual income. **24 C.F.R. § 5.609(c)(16).** Each party has presented its position on the meaning of this language and how it should be applied to Anthony's situation.

---

[1]   The Supremacy Clause, Article VI, Clause 2 of the Constitution, provides that if there is any conflict between federal and state law, federal law shall prevail. ***Gonzales v. Raich***, 545 U.S. 1, 29 (2005). Anthony does not explain how this provision is implicated.

Anthony proposes that three questions must be answered in determining if the income exclusion of § 5.609(c)(16) applies to her situation:

(1) Was the amount paid to her paid by a State agency?

(2) Was the amount paid to a family with a member who has a developmental disability and is living at home?, and,

(3) Was the amount paid to offset the cost of services and equipment needed to keep the developmentally disabled family member at home?

There appears to be no dispute regarding the second question.

According to Brenda Anthony, first through MED TEAM and now through Saldivar, she has been paid by the State of Texas, which funded the CBA program and now funds the STAR+PLUS program, to care for her disabled son.  The PHA contends, on the other hand, that Anthony's MED TEAM and Saldivar compensation is derived from private companies, not a State agency.  Anthony replies that the fact that the money is passed through a private company does not change the fact that she is being paid by a State agency.  Anthony also argues that the money she is paid offsets the cost of services which enable her to keep Gilbert at home as opposed to an institution, and which serves the purpose of the income exclusion. The PHA responds that Anthony is not incurring expenses and that the money she receives does not "offset" the cost of services as contemplated by § 5.609(c)(16).  Anthony replies that federal law

6

does not provide for a "family member" exception to the income exclusion rule; thus, payment for her services is the cost that is being offset.

The language of the HUD regulation does not clearly answer these questions.  Section 5.609(c)(16) neither explicitly requires a direct payment from a State agency nor does it permit State agency funds to pass through a private company.  Similarly, the regulation neither precludes a family member from providing the service which is being reimbursed with State funds nor does it permit the income exclusion without the actual incurring of expenses by the family.  The only authoritative guidance as to the meaning of § 5.609(c)(16) is a HUD opinion letter issued in March 2007.  Anthony and the PHA disagree on the weight and deference the opinion deserves.

The HUD opinion letter was issued regarding Anthony's particular situation and was rendered after Anthony, through her counsel, was permitted to provide input regarding the meaning of the regulation.  It concludes that working for a private employer to care for a disabled family member at home does not fall under the income exclusion.  This result was reached, first, because the State did not pay funds to the family but to MED TEAM, a private company.[2]  The second reason given was that § 5.609(c)(16) has no

---

[2]  The letter was issued in March 2007, prior to the date Saldivar began providing services to Gilbert Anthony.  However, the Court presumes, as no one argues otherwise, that the same rationale applies to Saldivar.

requirement that the family member receiving the state funds be employed to care for the developmentally disabled family member. HUD concluded that the fact that Anthony was hired to care specifically for her disabled adult son had no bearing upon § 5.609(c)(16). Finally, the HUD opinion states that § 5.609(c)(16) applies when the State agency pays a family member to offset the costs of services needed to keep the developmentally disabled family member at home. According to HUD, this implies the family member is incurring costs to keep the developmentally disabled family member at home the family, such as by hiring personal care attendants. The opinion concludes that, in the absence of any other legal authority or guidance to the contrary, § 5.609(c)(16) must be interpreted to be applicable only when two elements are met: (1) a state agency pays amounts to a family; and (2) the state funds are paid for the specific purpose of helping the family offset the cost of services needed to keep the disabled family member at home.

If a statute is silent or ambiguous with respect to a specific issue, the interpretation by the agency authorized to administer the statute must receive substantial deference. ***Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.***, 467 U.S. 837, 842-845 (1984). Deference in accordance with ***Chevron***, however, is warranted only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law,

and that the agency interpretation claiming deference was promulgated in the exercise of that authority." ***United States v. Mead Corp.***, 533 U.S. 218, 226-227 (2001).   Otherwise, the interpretation is "entitled to respect" only to the extent it has the "power to persuade." ***Skidmore v. Swift & Co.***, 323 U.S. 134, 140 (1944).

Substantial deference must also be given to an agency's interpretation of its own regulations. ***Thomas Jefferson University v. Shalala***, 512 U.S. 504, 512 (1994); ***Ali v. Gonzales***, 435 F.3d 544, 546 (5th Cir. 2006).   An agency's interpretation of its own ambiguous regulations is controlling unless plainly erroneous or inconsistent with the regulation. ***Christensen v. Harris County***, 529 U.S. 576, 588 (2000); ***Auer v. Robbins***, 519 U.S. 452, 461-463 (1997).  Courts must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. ***Thomas Jefferson University v. Shalala***, 512 U.S. at 512.

This Court concludes that the HUD opinion letter issued in March 2007 is entitled to substantial deference.  As noted above, Congress did not provide for income exclusions.  These exceptions were entirely a creation of HUD.   Thus, to the extent that regulation is ambiguous, it only makes sense that HUD's interpretation of its own regulation should be accorded great

9

weight.  No alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.  Thus, the HUD interpretation must be respected. *See Thomas Jefferson University v. Shalala*, 512 U.S. at 512.

Anthony responds that the HUD opinion letter is not entitled to deference.  She states that it is simply the view of an agency attorney, not HUD itself.  In *Christensen*, the Supreme Court held, in the context of an agency's effort to fill a statutory gap, that opinion letter-like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law, do not warrant *Chevron*-style deference. *Christensen v. Harris County*, 529 U.S. at 587.  However, because HUD is interpreting its own regulation, that interpretation, though is expressed through an opinion letter, warrants this Court's deference. *Belt v. EmCare, Inc.*, 351 F.Supp.2d 625, 634 (E.D.Tex. 2005). *See Auer*, 519 U.S. at 462 (Secretary's interpretation in the form of a legal brief does not make it unworthy of deference).  Anthony also argues that the March 2007 HUD letter is simply a *post hoc* rationalization to justify action already taken by the PHA.  This Court disagrees.  "There is simply no reason to suspect that the interpretation does not reflect the agency's fair and

10

considered judgment on the matter in question." **Auer**, 519 U.S. at
462.

Nothing suggests that the agency's interpretation of its own
ambiguous regulation is plainly erroneous or inconsistent with the
regulation.  The opinion letter noted that the State did not pay
funds to the family but to MED TEAM, a private company.  As noted
below, MED TEAM and Saldivar receive money from several sources.
Anthony may ultimately receive money through a State program but
not "[a]mounts paid by a State agency to a family..." **24 C.F.R. §
5.609(c)(16)**.  Such language is more suggestive of an intent that
the family receive a direct payment from a State agency, not the
pass through-type situation advocated by Anthony.  The regulation
could have but does not reference "amounts paid from or through a
State program."  Understanding the funding of the programs bolsters
HUD's conclusion.

Medicaid funds in Texas are partially state funds and
partially federal funds.  Prior to January 1, 2007, MED TEAM would
provide services, pay its employees, then seek reimbursement from
the Texas Department of Aging and Disability, which then sought
reimbursement from Medicaid.  MED TEAM is a for-profit corporation.
The PHA points out that, in addition to State funds, MED TEAM has
additional sources of income, including private insurance,
Medicaid, Medicare, and direct payments.  Saldivar also is a
for-profit corporation.  Saldivar also has sources of income in

11

addition to funds provided from the STAR+PLUS program, including private insurance, Medicare, and direct payments.

After January 1, 2007, a set amount is allocated by Medicaid to the HMO which takes full responsibility for all necessary services and expenses. Saldivar is reimbursed by the HMO only for approved services. According to the PHA, no State agency decides how much Anthony's family will receive. The decision is made by Saldivar based upon the amount of hours worked by Anthony, Saldivar's policies, and the services pre-approved by the HMO. The Court agrees with the PHA that the connection between payments from a State agency and those provided to Anthony are too tenuous to qualify under the income exclusion of § 5.609(c)(16). The HUD interpretation of the regulatory language to preclude funds passed through a private company is neither plainly erroneous nor inconsistent with the regulation.

As regards the offset of costs, Anthony contends that "the amount paid to [her] is paid to compensate (offset) the family for the cost (i.e., her labor and the amount the family must pay her for her services) to the family of the attendant services." She states that there is no "family member" exception to the income exclusion rule. The HUD opinion letter interpreted the phrase "to offset the cost of services" in § 5.609(c)(16) to mean that the family member actually incurred costs, such as by hiring personal care attendants, needed to keep the developmentally disabled family

12

member at home.  As the PHA notes, Anthony's wages were not paid to offset medical care for Gilbert but were used to purchase food, clothing, and other necessities for her and her family.  The HUD interpretation of the regulatory language to require that the amounts paid be used to offset costs actually incurred is neither plainly erroneous nor inconsistent with the regulation.

Anthony emphasizes that her interpretation of § 5.609(c)(16) serves the purpose of the income exclusion, which is to avoid institutionalization of the disabled family member.  She states that the program which pays for a personal care attendant to take care of Gilbert allows him to remain at home rather than be institutionalized.  She cites to the Public Housing Occupancy Guidebook, attached as exhibit 2 to plaintiff's motion for summary judgment, which contains a note indicating that the State funds alluded to in § 5.609(c)(16) are paid to prevent the institutionalization of a family member.

The PHA does not argue with the preference for home care. However, Anthony's position does not further that end. As the PHA points out, Gilbert has remained at home under the care of Anthony, as a paid personal care attendant, without the income exclusion. Anthony could have hired a personal care attendant and obtained for herself other, perhaps more lucrative, employment. Her decision to become his personal care attendant was not premised upon a belief that to act otherwise would result in his institutionalization.

13

Failure to accord Anthony the benefit of the income exclusion will not result in Gilbert's institutionalization.

The Court shall accord substantial deference to the March 2007 HUD opinion letter regarding the interpretation of § 5.609(c)(16). It addresses the precise issues which must be resolved in this suit.  The result reached is neither plainly erroneous nor inconsistent with the regulation.  The Court concludes that the PHA did not violate federal law in finding that income received by Anthony from MED TEAM and Saldivar as compensation for her services as a personal care attendant for her son is not excludable in determining her income-based rent for purposes of Section 8 housing.

Anthony's motion for summary judgment is **DENIED** and the PHA's motion for summary judgment is **GRANTED.**

It is so **ORDERED.**

**SIGNED** March 20, 2008.

_____
JOHN W. PRIMOMO
UNITED STATES MAGISTRATE JUDGE